| | | | |
|---|---|---|---|
| | AUSA: | Timothy McDonald | Telephone: (313) 226-9100 |
| AO 91 (Rev. 11/11) Criminal Complaint | Special Agent: | Robert Holbrook | Telephone: (313) 965-2323 |

# UNITED STATES DISTRICT COURT
### for the

### Eastern District of Michigan

| | | |
|---|---|---|
| United States of America<br>v.<br><br>Vincent Jacobus Munster<br>Claude Yinda Kwe | Case No. | Case: 2:26−mj−30139<br>Assigned To : Unassigned<br>Assign. Date : 3/17/2026<br>Description: CMP USA V. MUNSTER<br>ET AL (DJ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 25, 2026 _____ in the county of _____ Wayne _____ in the _____ Eastern _____ District of _____ Michigan _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 | False Statements |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Robert Holbrook, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____ March 17, 2026 _____

_____
*Judge's signature*

City and state: _Detroit, MI_ _____

Kimberly Altman, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Robert Holbrook, being sworn, depose and state the following:

## INTRODUCTION

1.      This affidavit is in support of a criminal complaint charging Vincent Jacobus MUNSTER and Claude Yinda KWE with violating 18 U.S.C. § 1001 (false statements).

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since 2019. I have received Basic Field training at the FBI Academy in Quantico, Virginia, as well as additional training and courses in counterintelligence investigations and operations. I am currently assigned to the FBI's Counterintelligence Division, Detroit Field Office, located at 477 Michigan Avenue, Detroit, Michigan. The FBI's Counterintelligence Division is responsible for exposing, preventing, and investigating ongoing national security threats from foreign intelligence services and other intelligence activities within the United States.

3.      I am a "federal law enforcement officer" within the meaning of Rule 41(a)(1)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws and is within any category of officers authorized by the Attorney General to request a search warrant and may apply for a federal search warrant pursuant to Rule 41(b).

1

4.      The facts contained in this affidavit come from my personal observations, my training and experience, my review of documents and statements, and information obtained from other law enforcement officers and individuals with knowledge of this matter. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not set forth all my knowledge regarding this matter.

### **PROBABLE CAUSE**

### Background on Mpox

5.      According to the World Health Organization, Mpox, an infectious disease, is caused by the monkeypox virus (MPXV) and can result in a painful rash, enlarged lymph nodes, fever, headache, muscle ache, back pain, and low energy. There are two distinct clades[1] of the virus: clade I (with subclades Ia and Ib) and clade II (with subclades IIa and IIb). A global outbreak of clade IIb began in 2022 and continues to this day, including in some African countries. There are also growing outbreaks of clades Ia and Ib affecting the Democratic Republic of the Congo and other countries in Africa. As of August 2024, clade Ib has also been detected beyond Africa.

---

[1] Within an evolutionary tree, a branch that includes a single common ancestor and all of its descendants is called a clade. *See* https://www.nature.com/scitable/definition/clade-269/

6.      The U.S. Department of Health and Human Services (HHS) oversees the scientific study and prevention of infectious diseases, such as Mpox, through several U.S. agencies (*e.g.*, Centers of Disease Control and Prevention (CDC) and the National Institutes of Health (NIH)). Specifically, HHS regulates the possession and importation of infectious diseases that pose a severe threat to public health and safety through the Select Agent Program, which is codified under the HHS Select Agent and Toxin Regulations (42 CFR § 73) and implemented through the CDC. These regulations provide comprehensive guidance on administrative procedures to maintain the safety and security of select agents. The Select Agent Program provides a list of infectious diseases and toxins that must comply with the regulations, to include viruses such as African viral hemorrhagic fever viruses (*e.g.*, Ebola) and orthopoxviruses (*e.g.*, Mpox). Specifically, Mpox Clade I is designated as a select agent under this regulation.[2]

<u>MUNSTER and KWE's Research at NIH</u>

7.      NIH comprises 27 institutes and centers. One of these institutes, the National Institute of Allergy and Infectious Diseases (NIAID), conducts basic and applied research to better understand, treat, and prevent infectious, immunologic, and allergic diseases. NIAID's Division of Intramural Research oversees a state-of-

---

[2]https://www.cdc.gov/monkeypox/php/laboratories/biosafety.html#cdc_generic_se ction_2-select-agent-regulations

3

the-art biomedical research facility, Rocky Mountain Laboratories (RML), located in Hamilton, Montana. RML employs approximately 450 people and conducts research on maximum containment pathogens, such as Ebola and SARS-CoV-2. RML houses a Biosafety Level 4 (BSL-4) facility – one of approximately 15 such facilities located in the United States. BSL-4 facilities implement the highest level of biosafety precautions for scientific research of known and potential human pathogens.

8.     The RML facility has 30 buildings on 36 acres of land and consists of several laboratories. MUNSTER and KWE are NIH employed researchers in one of these laboratories, the Laboratory of Virology (LV). According to the NIH website, LV is described as follows:[3]

> LV conducts innovative scientific research on viral agents requiring high or maximum containment (biosafety level-2 to biosafety level-4). These agents include filoviruses, bunyaviruses, arenaviruses, and flaviviruses. Research studies focus on vector/reservoir transmission, viral ecology, pathogenesis, pathophysiology, and host immune response of these viral pathogens. A significant goal is to develop diagnostics, vaccines, and therapeutics against these agents.
>
> LV scientists broadly study pathogens that cause viral hemorrhagic fevers, viral encephalitis, and certain respiratory diseases. This work employs investigations in cell culture; animal models, including nonhuman primates; reservoir species; and arthropod hosts in order to elucidate the viral pathogenesis, immune responses, molecular evolution, cellular and molecular biology, and vector-host interactions.

---

[3] https://www.niaid.nih.gov/research/lab-virology

9.      On this same website, MUNSTER is identified as the Chief of the

Virus Ecology Section within LV and provides a link with information regarding

MUNSTER's research program and biography on the NIH website. The NIH

website lists MUNSTER's biography:[4]

> Dr. Vincent Munster received his Ph.D. in virology from Erasmus University, Rotterdam, the Netherlands, in 2006. During his Ph.D. studies, Dr. Munster studied the ecology, evolution, and pathogenesis of avian influenza viruses. He continued his training at the Erasmus Medical Center from 2006 to 2009, where he worked within the Center for Research on Influenza Pathogenesis and Surveillance (CRIPS) focusing on pathogenicity and human-to-human transmission of influenza A viruses. Dr. Munster joined NIAID's Laboratory of Virology as a visiting fellow in 2009 to study the ecology of filoviruses and henipaviruses. In 2013, Dr. Munster established the Virus Ecology Unit as an independent tenure-track investigator. The mission of the Virus Ecology Unit is to elucidate the ecology of emerging viruses and drivers of zoonotic and cross-species transmission. The Virus Ecology Unit uses a combined field and experimental research approach and conducts research at the state-of-the-art high- and maximum-containment facilities of the Rocky Mountain Laboratories, as well as at field study sites in Africa (the Republic of the Congo, Mali), the Caribbean (Trinidad and Tobago), and the Middle East (Jordan).

10.     The aforementioned website identifies KWE as a research fellow in

MUNSTER's section. Additionally, the main objective of MUNSTER's Virus

Ecology Section is described as:

> "…aim[ing] to identify the underlying biotic or abiotic changes in virus-host ecology that allow … emerging viral pathogens to cross the species barrier. Recognizing both the strengths and weaknesses of a unilateral focus on field research on one hand and experimental research on the other, we set out to combine the best of both approaches

---

[4] https://www.niaid.nih.gov/research/vincent-j-munster-phd

5

in one research program, where we aim to identify drivers of cross-species transmission from data gathered in the field and model these drivers under experimental conditions in the lab."

11.     According to Google Scholar, and other scientific websites that provide publication statistics of scientific researchers, MUNSTER is a well published scientist with approximately 400 publications and 69,000 citations. Notably, MUNSTER published an influential scientific article in 2020 titled "Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1,"in the New England Journal of Medicine, which has approximately 14,000 citations and was influential in U.S. Government guidelines for the COVID-19 pandemic. MUNSTER and KWE have co-authored at least twelve scientific publications related to Mpox from 2023 to 2026. Of these twelve publications, six of them are co-authored with scientists at the Laboratoire National de Sante Publique located in Brazzaville, Republic of Congo.

CBP Inspection of MUNSTER and KWE on January 25, 2026

12.     On January 25, 2026, MUNSTER and KWE arrived at the McNamara Terminal of Detroit Metropolitan Airport on board Delta Flight 229 from Paris, France, with travel originating from Brazzaville, Republic of Congo. MUNSTER and KWE were inspected and interviewed by CBP officials upon their arrival.

13.     KWE was selected for a secondary inspection by CBP. CBP officers did not have prior knowledge that KWE was travelling with MUNSTER. CBP

6

officers approached KWE at primary inspection and instructed him to retrieve his checked luggage for secondary inspection. CBP officers observed nervous behavior from KWE. CBP officers observed KWE retrieve a large black plastic case and place the case on a cart next to an unknown individual. CBP officers approached the unknown individual and identified him as MUNSTER and learned that MUNSTER and KWE were co-travelers.

14.	Upon collecting their luggage, CBP officers escorted MUNSTER and KWE to the passport control area to conduct their secondary inspection. CBP officers noted the large black plastic case was atypical of business travel luggage. MUNSTER appeared to possess it. While walking from the baggage claim area to the passport control area, CBP officers asked what was in the large black plastic case. MUNSTER stated it was diagnostics and testing equipment. CBP officers informed MUNSTER and KWE that they would need to present the necessary documentation for the materials. MUNSTER stated all documentation was on his laptop.

15.	FBI's subsequent investigation revealed the large black plastic case contained biological materials, which FBI laboratory tests confirmed that they were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United

7

States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements regarding the contents of the large black plastic case to CBP officers were materially false.

16.    Upon arrival at the passport control area, MUNSTER was instructed to access all required documentation. MUNSTER replied, "yes, yes, it's all in my laptop, but you won't need them. I do this all the time." MUNSTER was instructed again to retrieve the required documentation. MUNSTER remained in the lobby of the passport control area and KWE was interviewed separately by CBP officers.

17.    FBI's subsequent investigation revealed MUNSTER possessed biological materials, which FBI laboratory tests confirmed that they were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements regarding the possession of the required documentation to CBP officers were materially false.

18.    During the interview, KWE said that he and MUNSTER were on a work trip for RML. KWE explained that RML fell under NIAID, which is an institute of NIH under HHS. KWE stated the laboratory was a BSL-4 facility, which is the highest laboratory security level. KWE stated he and MUNSTER were

8

virologists, tasked with studying viruses, such as Ebola, Mpox, MERS-CoV, Nipah, and/or any other novel emerging infectious viruses. KWE stated their goals were to study viruses that have outbreaks with potential impact to the United States. KWE stated that MUNSTER was his direct supervisor.

19.     KWE also said that he and MUNSTER travelled to the Republic of Congo for nine days to study a strain of Mpox that is currently causing an outbreak. KWE stated the strain of Mpox was considered a moderate concern for outbreak in the United States, and this version of the virus differed from the one that caused localized outbreaks in the United States in 2022. KWE identified Francine NTOUMI was leading the Mpox research and control efforts in the Republic of Congo and that he and MUNSTER had contact with her laboratory and staff while on the trip.

20.     KWE was asked about the contents of the large black plastic case. KWE stated they brought "diagnostics" with them for their trip and were returning with them. CBP officers explicitly asked KWE if he or MUNSTER were in possession of any samples or materials gathered during their field research. KWE stated they were not and that the contents were only "diagnostics." KWE confirmed to CBP officers that he was aware of the regulations for transporting samples or diagnostics and stated MUNSTER would be the one handling the transportation of the diagnostics in their possession.

9

21.     FBI's subsequent investigation revealed the large black plastic case contained biological materials, which FBI laboratory tests confirmed that they were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Further, KWE was discovered to be a subordinate of MUNSTER at NIH and it reasonable to believe KWE had knowledge of the true identity of samples. Based on FBI's investigation, it is reasonable to believe that KWE's statements regarding the contents of the large black plastic case as only diagnostics to CBP officers were materially false.

22.     At the conclusion of the interview of KWE, CBP officers informed KWE that he and MUNSTER would have their luggage examined by CBP Agricultural Specialists. KWE was instructed to fully declare all materials in their possession. KWE agreed to do so.

23.     While enroute from the passport control area to the agricultural inspection area, CBP officers explicitly asked MUNSTER if they were in possession of any biologicals, samples, or anything that may need additional documentation. MUNSTER adamantly denied any biological materials or samples. MUNSTER said that he possessed all necessary documentation for the

10

"diagnostics" as he transported them regularly. MUNSTER also said that he had everything he needed and that this wasn't his first time.

24.     FBI's subsequent investigation revealed MUNSTER possessed biological materials, which FBI laboratory tests confirmed that they were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements denying the possession of biologic samples to CBP officers were materially false.

25.     During the agricultural inspection, officers inspected MUNSTER's and KWE's luggage and found a laptop computer and U.S. Government Personal Identity Verification (PIV) cards for MUNSTER and KWE. MUNSTER identified himself as the "guy in charge" and said that KWE worked for him. MUNSTER also said that he wasn't carrying anything that he should not be and that he had shipped biological materials in the past via World Courier. MUNSTER provided documentation for the diagnostics, which consisted of a list of approximately 40 to 50 items and was written in French. MUNSTER identified one of the items as the materials in his possession. When asked what the materials were specifically, MUNSTER said that they were a fast RADI Mpox kit from KH Medical company.

11

MUNSTER also said that the materials were an "assay" and were a mixture of ingredients. MUNSTER identified the ingredients as "dNTPs nucleotides, Forward Primer 1, Reverse Primer 2, Probe-Fam labelled, and mg magnesium chloride." MUNSTER was asked to write down the ingredients of the materials in his possession. *See* Figure 1.



*Figure 1*

26.     FBI's subsequent investigation revealed MUNSTER possessed biological materials, which FBI laboratory tests confirmed that they were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements describing materials in his possession as diagnostic kit components and supporting documentation to a CBP Agricultural Specialist were materially false.

12

27.     Based on MUNSTER's explanation, the CBP Agricultural Specialist

believed the case containing the biological materials was safe to open and inspect.

Upon opening the case, two plastic containers containing 113 microcentrifuge

tubes were discovered in Styrofoam coolers. *See* Figure 2.



*Figure 2*

28.     The CBP Agricultural Specialist observed markings on the tubes and

asked MUNSTER what the markings on the tubes meant. MUNSTER said that he

trained people in the Republic of Congo to make these samples and that the

numbers were for inventory. This explanation did not make sense to the CBP

Agricultural Specialist because the numbers appeared to be random and were not

in numerical order. MUNSTER said that the materials were used to stop the spread

of Mpox and he did not want to leave the materials behind because the materials

needed to be refrigerated. When MUNSTER was asked why he and KWE would

13

be bringing the materials back with them if they had trained people to use the kits to stop the spread of Mpox, MUNSTER explained that bringing the materials back would save them money because the kits could be used again in their laboratory. Based on MUNSTER's unsatisfactory documentation and explanation, CBP Agricultural Specialists seized the 113 microcentrifuge tubes (hereinafter "the biological materials") from MUNSTER at the conclusion of the inspection. The biological materials were held at the airline's bonded warehouse to be returned to MUNSTER pending proper documentation.

29.     FBI's subsequent investigation revealed MUNSTER possessed biological materials, which FBI laboratory tests confirmed that they were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements further describing the 113 microcentrifuge tubes as diagnostics used in conjunction for his purpose of travel to the Republic of Congo to a CBP Agricultural Specialist were materially false.

<u>Seized Biological Materials Identified as Mpox</u>

30.     On or about January 26, 2025, FBI was notified of the inspection of MUNSTER and KWE and seizure of biological materials, and FBI began

14

investigative efforts to ascertain the circumstances of the inspection and seizure. At the time of the initial notice, I reviewed the images obtained at the time of the seizure by CBP of the microcentrifuge tubes. Based on the information provided by CBP officers and my training and experience, the high number and sequential, numerical labelling of the microcentrifuge tubes did not appear consistent with a diagnostic test kit.

31.     FBI's investigation revealed that on or about January 26, 2025, an NIH employee, who oversees the NIH's Division of Safety and National Biosafety and Biocontainment Training Program (hereinafter "the NIH Official") was notified of CBP's inspection of MUNSTER and KWE and the seizure of biological materials. On or about January 26, 2026, the NIH Official contacted MUNSTER directly via teleconference to determine the identity of the biological materials for public safety and regulatory compliance. MUNSTER's statements regarding the CBP incident to the NIH Official are unknown to FBI investigators. The NIH Official told MUNSTER to provide the identities of the seized biological materials. On or about January 27, 2026, MUNSTER provided an excel spreadsheet in response to the request via email to the NIH Official. Based on CBP records, the NIH Official contacted CBP at DTW on January 27, 2026, to inform them that the seized biological materials were "…some DNA isolates."

15

32.     On or about January 27, 2026, FBI took custody of the seized biological materials for forensic analysis by the FBI Laboratory Division. FBI Laboratory Division personnel requested additional information on the identity of the biological materials for health safety and determination of the appropriate testing protocols. The NIH Official provided the excel spreadsheet obtained from MUNSTER to FBI on or about January 28, 2026. The excel spreadsheet contained a sequential, numerical labelling scheme that identified the age, gender, region, and date of onset of symptoms of Mpox infected patients located in the Republic of Congo. The labelling scheme in the excel spreadsheet was consistent with the markings on the seized microcentrifuge tubes. Further, the excel spreadsheet contained a sheet, labelled "Laboratory result," which identified each sample's "prelim diagnosis" as Mpox clade 1. Additionally, the excel spreadsheet contained a sheet, labelled "Materials and Methods," which stated the following:

> Samples were handled in a Class III biosafety cabinet. DNA was extracted using the QIAamp DNA Mini Kit (Qiagen, Hilden, Germany), with an initial AVL ethanol inactivatio[n] step, following the manufacturer's instructions. The extracted DNA was subsequently used for molecular diagnosis.

33.     The FBI Laboratory has begun testing the 113 seized samples and has completed analysis of 12 of the 113 samples seized as of the date of this affidavit. Based on my review of the laboratory report and discussions with FBI Laboratory personnel, 11 of the samples were identified to contain DNA for Mpox clade 1

16

with human background. One of the samples was identified to contain DNA for Human alphaherpesvirus 3 (*i.e.*, Chicken Pox) with a human background. All samples tested did not propagate and thus, assessed to be inactivated (*i.e.*, a "dead" virus, unable to cause disease infection). Furthermore, the DNA identified in the samples did not appear to be samples from, or used in conjunction, with a diagnostic kit.

34.     Based on the facts described above, my training and experience, and discussions with other government personnel, I believe that MUNSTER  and KWE violated 18 U.S.C. § 1001 (false statements). Specifically, MUNSTER made false statements when he told CBP Officers he did not have the biological pathogen, Mpox, in his possession, denied knowledge of the identity and origin of the biological materials, and make materially false statements that the materials were "diagnostics." Similarly, KWE also made false statements when he told CBP Officers that MUNSTER did not have the biological pathogen, Mpox, in his possession, denied knowledge of the identity and origin of the biological materials, and make materially false statements that the materials were "diagnostics."

## CONCLUSION

35.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that Vincent Jacobus MUNSTER and Claude Yinda KWE have violated 18 U.S.C. § 1001 (false statements).

17

Therefore, I respectfully request that the Court issue a criminal complaint and corresponding arrest warrant for Vincent Jacobus MUNSTER and Claude Yinda KWE.

_____
Robert Holbrook
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me in my presence
And/or by reliable electronic means.

_____
Hon. Kimberly Altman
United States Magistrate Judge

March 17, 2026

18