| | | | |
|---|---|---|---|
| | AUSA: | Timothy McDonald | Telephone: (313) 226-9100 |
| AO 91 (Rev. 11/11) Criminal Complaint | Special Agent: | Robert Holbrook, FBI | Telephone: (313) 965-2323 |

# UNITED STATES DISTRICT COURT
### for the
## Eastern District of Michigan

United States of America

   v.

D-1 Vincent Jacobus Munster,
D-2 Claude Yinda Kwe.

Case No. 26-mj-30139

## AMENDED CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 25, 2026 _____ in the county of _____ Wayne _____ in the _____ Eastern _____ District of _____ Michigan _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371 and 545 | Conspiracy to Import Merchandise Contrary to Law. |
| 18 U.S.C. § 1001 | False Statements. |

This criminal complaint is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Robert Holbrook, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _May 29, 2026_____

_____
*Judge's signature*

City and state: _Detroit, MI_____

David R. Grand, United States Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AMENDED COMPLAINT

I, Robert Holbrook, being sworn, depose and state the following:

## INTRODUCTION

1.      This affidavit is in support of an amended criminal complaint and arrest warrants charging Vincent Jacobus MUNSTER and Claude Yinda KWE with conspiracy to import merchandise contrary to law, in violation of 18 U.S.C. §§ 371 and 545, and false statements, in violation of 18 U.S.C. § 1001.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since 2019. I have received Basic Field training at the FBI Academy in Quantico, Virginia, as well as additional training and courses in counterintelligence investigations and operations. I am currently assigned to the FBI's Counterintelligence Division, Detroit Field Office, located at 477 Michigan Avenue, Detroit, Michigan. The FBI's Counterintelligence Division is responsible for exposing, preventing, and investigating ongoing national security threats from foreign intelligence services and other intelligence activities within the United States.

3.      I am a "federal law enforcement officer" within the meaning of Rule 41(a)(1)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws and is within any category of officers authorized by the Attorney General to request a search warrant and may apply for a federal search warrant pursuant to Rule 41(b).

1

4. The facts contained in this affidavit come from my personal observations, my training and experience, my review of documents and statements, and information obtained from other law enforcement officers and individuals with knowledge of this matter. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and arrest warrants and does not set forth all my knowledge regarding this matter.

## **PROBABLE CAUSE**

### Background on Mpox

5. According to the World Health Organization, Mpox, an infectious disease, is caused by the monkeypox virus (MPXV) and can result in a painful rash, enlarged lymph nodes, fever, headache, muscle ache, back pain, and low energy. There are two distinct clades[1] of the virus: clade I (with subclades Ia and Ib) and clade II (with subclades IIa and IIb). A global outbreak of clade IIb began in 2022 and continues to this day, including in some African countries. There are also growing outbreaks of clades Ia and Ib affecting the Democratic Republic of the Congo and other countries in Africa. As of August 2024, clade Ib has also been detected beyond Africa.

---

[1] Within an evolutionary tree, a branch that includes a single common ancestor and all of its descendants is called a clade. *See* https://www.nature.com/scitable/definition/clade-269/

6. The U.S. Department of Health and Human Services (HHS) oversees the scientific study and prevention of infectious diseases, such as Mpox, through several U.S. agencies (*e.g.*, Centers of Disease Control and Prevention (CDC) and the National Institutes of Health (NIH)). Specifically, HHS regulates the possession and importation of infectious diseases that pose a severe threat to public health and safety through the Select Agent Program, which is codified under the HHS Select Agent and Toxin Regulations (42 CFR § 73) and implemented through the CDC. These regulations provide comprehensive guidance on administrative procedures to maintain the safety and security of select agents. The Select Agent Program provides a list of infectious diseases and toxins that must comply with the regulations, to include viruses such as African viral hemorrhagic fever viruses (*e.g.*, Ebola) and orthopoxviruses (*e.g.*, Mpox). Specifically, Mpox Clade I is designated as a select agent under this regulation.[2]

7. Exclusions for the Select Agent designation are detailed under 42 C.F.R. § 73.3, which includes, "[a] select agent or regulated nucleic acids that can produce infectious forms of any select agent virus that has been subjected to a validated inactivation procedure that is confirmed through a viability testing protocol.…" (42 C.F.R. § 73.3(d)(4)). Inactivation procedures are required to be

---

[2]https://www.cdc.gov/monkeypox/php/laboratories/biosafety.html#cdc_generic_se
ction_2-select-agent-regulations

3

reviewed annually by a principal investigator and failures of an inactivation method are to be reported to the CDC immediately, as regulated under 42 C.F.R. § 73.9(a)(9) and 42 C.F.R. § 73.9(a)(8), respectively. Detailed records of inactivation of a Select Agent are to be maintained, as regulated under 42 C.F.R. § 73.17(a)(8). The physical transfer of the deactivated Select Agent from one location to other is regulated under 42 C.F.R. § 73.17(a)(8)(vii), which states, "[a] certificate, signed by the Principal Investigator, that includes the date of inactivation or viable select agent removal, the validated inactivation or viable select agent removal method used, and the name of the Principal Investigator. A copy of the certificate must accompany any transfer of inactivated or select agent removed material."

8. Additionally, 42 C.F.R. § 71.54 provides detailed regulations on the importation of infectious biological agents, infectious substances, and vectors. In general, infectious biological agents require permitting for importation. However, permits are not required if the specimen only consists of nucleic acids. In this instance, the specimen must be accompanied by an importer certification statement confirming that the material is not known to contain or suspected of containing an infectious biological agent, under 42 C.F.R. § 71.54(f)(4).

9. Under circumstances in which a certification of inactivation of the select agent or a statement confirming that the material is not known to contain or suspected of containing an infectious biological agent, a permit for importation

4

may be required by U.S. Department of Agriculture (USDA) under 9 C.F.R. § 122.2 for the importation of organisms or their derivatives considered pathogenic to livestock and poultry.

10.     All articles brought into the United States by any individual must be declared to a CBP Officer at the port of first arrival in the United States (19 C.F.R. § 148.11). In addition, when transporting non-infectious biological samples by air, the specimens must be legibly marked "scientific research specimens" and failure to do so is a violation of 49 C.F.R. § 173.4b(b)(5).

<u>MUNSTER and KWE's Research at NIH</u>

11.     NIH comprises 27 institutes and centers. One of these institutes, the National Institute of Allergy and Infectious Diseases (NIAID), conducts basic and applied research to better understand, treat, and prevent infectious, immunologic, and allergic diseases. NIAID's Division of Intramural Research oversees a state-of-the-art biomedical research facility, Rocky Mountain Laboratories (RML), located in Hamilton, Montana. RML employs approximately 450 people and conducts research on maximum containment pathogens, such as Ebola. RML houses a Biosafety Level 4 (BSL-4) facility – one of approximately 15 such facilities located in the United States. BSL-4 facilities implement the highest level of biosafety precautions for scientific research of known and potential human pathogens.

5

12.     The RML facility has 30 buildings on 36 acres of land and consists of several laboratories. MUNSTER and KWE are NIH employed researchers in one of these laboratories, the Laboratory of Virology (LV). According to the NIH website, LV is described as follows:[3]

> LV conducts innovative scientific research on viral agents requiring high or maximum containment (biosafety level-2 to biosafety level-4). These agents include filoviruses, bunyaviruses, arenaviruses, and flaviviruses. Research studies focus on vector/reservoir transmission, viral ecology, pathogenesis, pathophysiology, and host immune response of these viral pathogens. A significant goal is to develop diagnostics, vaccines, and therapeutics against these agents.
>
> LV scientists broadly study pathogens that cause viral hemorrhagic fevers, viral encephalitis, and certain respiratory diseases. This work employs investigations in cell culture; animal models, including nonhuman primates; reservoir species; and arthropod hosts in order to elucidate the viral pathogenesis, immune responses, molecular evolution, cellular and molecular biology, and vector-host interactions.

13.     On this same website, MUNSTER is identified as the Chief of the Virus Ecology Section within LV and provides a link with information regarding MUNSTER's research program and biography on the NIH website. The NIH website lists MUNSTER's biography:[4]

> Dr. Vincent Munster received his Ph.D. in virology from Erasmus University, Rotterdam, the Netherlands, in 2006. During his Ph.D. studies, Dr. Munster studied the ecology, evolution, and pathogenesis of avian influenza viruses. He continued his training at the Erasmus Medical Center from 2006 to 2009, where he worked within the Center for Research on Influenza Pathogenesis and Surveillance (CRIPS)

---

[3] https://www.niaid.nih.gov/research/lab-virology
[4] https://www.niaid.nih.gov/research/vincent-j-munster-phd

6

focusing on pathogenicity and human-to-human transmission of influenza A viruses. Dr. Munster joined NIAID's Laboratory of Virology as a visiting fellow in 2009 to study the ecology of filoviruses and henipaviruses. In 2013, Dr. Munster established the Virus Ecology Unit as an independent tenure-track investigator. The mission of the Virus Ecology Unit is to elucidate the ecology of emerging viruses and drivers of zoonotic and cross-species transmission. The Virus Ecology Unit uses a combined field and experimental research approach and conducts research at the state-of-the-art high- and maximum-containment facilities of the Rocky Mountain Laboratories, as well as at field study sites in Africa (the Republic of the Congo, Mali), the Caribbean (Trinidad and Tobago), and the Middle East (Jordan).

14.    The aforementioned website identifies KWE as a research fellow in MUNSTER's section. Additionally, the main objective of MUNSTER's Virus Ecology Section is described as:

"…aim[ing] to identify the underlying biotic or abiotic changes in virus-host ecology that allow … emerging viral pathogens to cross the species barrier. Recognizing both the strengths and weaknesses of a unilateral focus on field research on one hand and experimental research on the other, we set out to combine the best of both approaches in one research program, where we aim to identify drivers of cross-species transmission from data gathered in the field and model these drivers under experimental conditions in the lab."

15.    According to Google Scholar, and other scientific websites that provide publication statistics of scientific researchers, MUNSTER is a well published scientist with approximately 400 publications and 69,000 citations. MUNSTER and KWE have co-authored at least twelve scientific publications related to Mpox from 2023 to 2026. Of these twelve publications, six of them are

7

co-authored with scientists at the Laboratoire National de Sante Publique located in Brazzaville, Republic of Congo.

CBP Inspection of MUNSTER and KWE on January 25, 2026

16.    On January 25, 2026, MUNSTER and KWE arrived at the McNamara Terminal of Detroit Metropolitan Airport on board Delta Flight 229 from Paris, France, with travel originating from Brazzaville, Republic of Congo. MUNSTER and KWE were inspected and interviewed by CBP officials upon their arrival.

17.    KWE was selected for a secondary inspection by CBP. CBP officers did not have prior knowledge that KWE was traveling with MUNSTER. CBP officers approached KWE at primary inspection and instructed him to retrieve his checked luggage for secondary inspection. CBP officers observed nervous behavior from KWE. CBP officers observed KWE retrieve a large black plastic case and place the case on a cart next to an unknown individual. CBP officers approached the unknown individual and identified him as MUNSTER and learned that MUNSTER and KWE were co-travelers.

18.     Upon collecting their luggage, CBP officers escorted MUNSTER and KWE to the passport control area to conduct their secondary inspection. CBP officers noted the large black plastic case was atypical of business travel luggage. MUNSTER appeared to possess it. While walking from the baggage claim area to the passport control area, CBP officers asked what was in the large black plastic

8

case. MUNSTER told CBP officers the case contained diagnostics and testing equipment. CBP officers informed MUNSTER and KWE that they would need to present the necessary documentation for the materials. MUNSTER stated all documentation was on his laptop.

19.     FBI's subsequent investigation revealed the large black plastic case contained biological materials, which FBI laboratory tests confirmed, were, in fact, not diagnostics, but were instead deactivated[5] monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements regarding the contents of the large black plastic case to CBP officers were materially false.

20.     Upon arrival at the passport control area, MUNSTER was instructed to access all required documentation. MUNSTER replied, "yes, yes, it's all in my laptop, but you won't need them. I do this all the time." MUNSTER was instructed again to retrieve the required documentation. MUNSTER remained in the lobby of the passport control area and KWE was interviewed separately by CBP officers.

---

[5] A deactivated (or inactivated) virus is a pathogen that has been killed or rendered incapable of reproducing and causing disease, usually through heat, chemicals, or radiation.

21.     FBI's subsequent investigation revealed MUNSTER possessed biological materials, which FBI laboratory tests confirmed, were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements regarding the possession of the required documentation to CBP officers were materially false.

22.     During the interview, KWE said that he and MUNSTER were on a work trip for RML. KWE explained that RML fell under NIAID, which is an institute of NIH under HHS. KWE stated the laboratory was a BSL-4 facility, which is the highest laboratory security level. KWE stated he and MUNSTER were virologists, tasked with studying viruses, such as Ebola, Mpox, Nipah, and/or any other novel emerging infectious viruses. KWE stated their goals were to study viruses that have outbreaks with potential impact to the United States. KWE stated that MUNSTER was his direct supervisor.

23.     KWE also said that he and MUNSTER traveled to the Republic of Congo for nine days to study a strain of Mpox that is currently causing an outbreak. KWE stated the strain of Mpox was considered a moderate concern for outbreak in the United States, and this version of the virus differed from the one that caused localized outbreaks in the United States in 2022. KWE stated that

10

Francine NTOUMI was leading the Mpox research and control efforts in the Republic of Congo and that he and MUNSTER had contact with her laboratory and staff while on the trip.

24.     KWE was asked about the contents of the large black plastic case. KWE stated they brought "diagnostics" with them for their trip and were returning with them. CBP officers explicitly asked KWE if he or MUNSTER were in possession of any samples or materials gathered during their field research. KWE stated they were not and that the contents were only "diagnostics." KWE confirmed to CBP officers that he was aware of the regulations for transporting samples or diagnostics and stated MUNSTER would be the one handling the transportation of the diagnostics in their possession.

25.     FBI's subsequent investigation revealed the large black plastic case contained biological materials, which FBI laboratory tests confirmed, were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Further, KWE was discovered to be a subordinate of MUNSTER at NIH, and it reasonable to believe KWE had knowledge of the true identity of the samples. Based on FBI's investigation, it is reasonable to believe that KWE's

11

statements regarding the contents of the large black plastic case as only diagnostics to CBP officers were materially false.

26. At the conclusion of the interview of KWE, CBP officers informed KWE that he and MUNSTER would have their luggage examined by CBP Agricultural Specialists. KWE was instructed to fully declare all materials in their possession. KWE agreed to do so.

27. While enroute from the passport control area to the agricultural inspection area, CBP officers explicitly asked MUNSTER if they were in possession of any biologicals, samples, or anything that may need additional documentation. MUNSTER adamantly denied any biological materials or samples. MUNSTER said that he possessed all necessary documentation for the "diagnostics" as he transported them regularly. MUNSTER also said that he had everything he needed and that this wasn't his first time.

28. FBI's subsequent investigation revealed MUNSTER possessed biological materials, which FBI laboratory tests confirmed, were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements denying the possession of biologic samples to CBP officers were materially false.

12

29.     During the agricultural inspection, officers inspected MUNSTER's and KWE's luggage and found a laptop computer and U.S. Government Personal Identity Verification (PIV) cards for MUNSTER and KWE. MUNSTER identified himself as the "guy in charge" and said that KWE worked for him. MUNSTER also said that he wasn't carrying anything that he should not be and that he had shipped biological materials in the past via World Courier. MUNSTER provided documentation for the diagnostics, which consisted of a list of approximately 40 to 50 items and was written in French. MUNSTER identified one of the items as the materials in his possession. When asked what the materials were specifically, MUNSTER said that they were a fast RADI Mpox kit from KH Medical company. MUNSTER also said that the materials were an "assay" and were a mixture of ingredients. MUNSTER identified the ingredients as "dNTPs nucleotides, Forward Primer 1, Reverse Primer 2, Probe-Fam labelled, and mg magnesium chloride." MUNSTER was asked to write down the ingredients of the materials in his possession. *See* Figure 1.

13



*Figure 1*

30.     FBI's subsequent investigation revealed MUNSTER possessed biological materials, which FBI laboratory tests confirmed, were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements describing materials in his possession as diagnostic kit components and supporting documentation to a CBP Agricultural Specialist were materially false.

31.     Based on MUNSTER's explanation, the CBP Agricultural Specialist believed the case containing the biological materials was safe to open and inspect. Upon opening the case, two plastic containers containing 113 microcentrifuge tubes were discovered in Styrofoam coolers. *See* Figure 2.



*Figure 2*

32.     The CBP Agricultural Specialist observed markings on the tubes and asked MUNSTER what the markings on the tubes meant. MUNSTER said that he trained people in the Republic of Congo to make these samples and that the numbers were for inventory. This explanation did not make sense to the CBP Agricultural Specialist because the numbers appeared to be random and were not in numerical order. MUNSTER said that the materials were used to stop the spread of Mpox and he did not want to leave the materials behind because the materials needed to be refrigerated. When MUNSTER was asked why he and KWE would be bringing the materials back with them if they had trained people to use the kits to stop the spread of Mpox, MUNSTER explained that bringing the materials back would save them money because the kits could be used again in their laboratory. Based on MUNSTER's unsatisfactory documentation and explanation, CBP

15

Agricultural Specialists seized the 113 microcentrifuge tubes (hereinafter "the biological materials") from MUNSTER at the conclusion of the inspection. The biological materials were held at the airline's bonded warehouse to be returned to MUNSTER pending proper documentation.

33.     FBI's subsequent investigation revealed MUNSTER possessed biological materials, which FBI laboratory tests confirmed, were, in fact, not diagnostics, but were instead deactivated monkeypox virus that MUNSTER would need specific approval and documentation to travel with via commercial flight and would have needed to declare upon arrival into the United States. Based on FBI's investigation, it is reasonable to believe that MUNSTER's statements further describing the 113 microcentrifuge tubes as diagnostics used in conjunction for his purpose of travel to the Republic of Congo to a CBP Agricultural Specialist were materially false.

<u>Seized Biological Materials Identified as Mpox</u>

34.     On or about January 26, 2025, FBI was notified of the inspection of MUNSTER and KWE and seizure of biological materials, and FBI began investigative efforts to ascertain the circumstances of the inspection and seizure. At the time of the initial notice, I reviewed the images obtained at the time of the seizure by CBP of the microcentrifuge tubes. Based on the information provided by CBP officers and my training and experience, the high number and sequential,

16

numerical labeling of the microcentrifuge tubes did not appear consistent with a diagnostic test kit.

35.     The FBI Laboratory has begun testing the 113 seized samples and has completed analysis of 20 of the 113 samples seized as of the date of this affidavit. Based on my review of the laboratory reports and discussions with FBI Laboratory personnel, 13 of the samples were identified to contain DNA for Mpox clade 1 with human background. One of the samples was identified to contain DNA for Mpox Clade II with human background. Three of the samples were identified to contain DNA for Mpox (clade could not be identified) with human background. Two of the samples were identified to contain DNA for only human background. One of the samples was identified to contain DNA for Human alphaherpesvirus 3 (*i.e.*, Chicken Pox) with a human background. A set of samples tested did not propagate and thus are assessed to be inactivated (*i.e.*, a "dead" virus, unable to cause disease infection, non-infectious, or deactivated). Furthermore, the DNA identified in the samples did not appear to be samples from, or used in conjunction, with a diagnostic kit.

36.     Based on the facts described above, my training and experience, and discussions with other government personnel, I believe that MUNSTER and KWE conspired to knowingly import or bring into the United States human samples of inactivated Mpox (formerly monkeypox) contrary to law, in violation of 18 U.S.C.

§§ 371 and 545 and made material false statements about the nature of these samples during an inspection by U.S. Customs and Border Protection, in violation of 18 U.S.C § 1001.

37.     Specifically, Mpox Clade I is designated as a select agent under 42 C.F.R. § 73 (Select Agent and Toxin Regulations) and provides extensive regulations on the transport of these agents. Additionally, 42 C.F.R. § 71.54 (Import Regulations for Infectious Biological Agents, Substances, and Vectors) provide specific guidelines for the importation of infectious biological materials. Although the regulations provide more permissive requirements on deactivated select agents or biological materials rendered noninfectious, certification of deactivation upon declaration for importation into the United States is required. MUNSTER and KWE did not present the true identities of the biological materials in their possession and did not provide or possess the necessary certifications. Rather, MUNSTER and KWE attempted to pass the samples off as unused diagnostics.

38.     FBI investigators consulted USDA officials whether a permit would be required for the importation of research samples consisting of isolated Mpox DNA. On May 15, 2026, a USDA official from Veterinary Services, Animal Product Import and Export, provided FBI with a determination that importation of

18

isolated Mpox DNA requires a USDA permit, VS Form 16-6A, under 9 C.F.R. § 122.2.

39.     Moreover, MUNSTER and KWE failed to declare the Mpox Clade I samples they brought into the United States to a CBP Officer at the port of first arrival, in violation of 19 C.F.R. § 148.11. In addition, MUNSTER and KWE failed to legibly mark the outer package of the non-infectious Mpox Clade I biological samples as "scientific research specimens," when they transported these specimens by air into the United States, in violation of 49 C.F.R. § 173.4b(b)(5).

40.     Therefore, I reasonably believe MUNSTER and KWE knowingly imported or brought into the United States Mpox Clade I samples contrary to law (e.g., the Select Agent requirements codified under 42 C.F.R. § 73 & 42 C.F.R. § 71.54, the declaration requirements codified under 19 C.F.R § 148.11, the transportation by air of biological samples codified under 49 C.F.R. § 173.4b, and the USDA permit requirements under 9 C.F.R. § 122.2).

<u>MUNSTER and KWE's NIH Policy Violations</u>

41.     NIH's Office of Research Services, Division of Occupational Health and Safety, Quarantine Permit Service Office (QPSO) issued guidance for the importation of biological materials for NIH employees and researchers. This guidance is published in the NIH Policy Manual, Chapter 1340-1, "Permits for the

19

Import, Transfer, or Export of Biological Materials." In the section, "B. Scope," of Chapter 1340-1, the scope of the policy guide is provided as follows:

> This policy applies to biological materials used in intramural research including vectors of human, animal, or plant disease (e.g. insects or bats) transferred to or from any NIH facilities. ***All NIH personnel must comply with this policy.*** [emphasis added]

42.     In the section, "C. Background," of Chapter 1340-1 of the NIH Policy Guide, the consequences of failing to comply with the policy is provided as follows:

> Failure to comply with import, transfer, or export requirements may delay the delivery of a shipment. Biological materials that are incorrectly imported or exported may result in confiscation and/or destruction of the package by CBP personnel at the port of entry. Personal, civil and criminal penalties have been established for willful violation of regulations related to biological transport.

43.     In the section, "H. Procedures, 1. Imports," of Chapter 1340-1 of the NIH Policy Guide, the procedures outlined in the policy is provided as follows:

> b. A person wishing to import any biological material or vector of human disease must first request authorization from the QPSO[6]. Requests may be submitted electronically through the QPSO webpage. The QPSO will determine the need for a CDC import permit or a NIH letter for non-infectious import and will direct the researcher to the required approval process…
>
> f. No person at the NIH shall further distribute an imported infectious biological agent, infectious substance, vector, diagnostic specimen, or

---

[6] The Quarantine Permit Service Office (QPSO) is an office within the NIH responsible for making determinations for import permits, issuance of letters for material exempted from Public Health Service import permits and export control for these items. https://news2use.ors.nih.gov/Pages/what-is-QPSO-why-important.aspx

genomic material until applicable permits and/or authorizations are granted.

44.     Additionally, NIH provides specific requirements for its employees regarding the importation or exportation of non-infectious biological materials via aircraft. The guidance outlines six requirements for compliance and are stated as follows:

Non-infectious biological material may be hand carried aboard aircraft. However, the NIH does not recommend or encourage this practice.

If NIH employees, including contract support staff, elect to hand-carry non-infectious biological material aboard aircraft they will be responsible for the safe and secure transfer of this material and must adhere to the following requirements.

NIH staff who intend to travel with non-infectious biological materials aboard aircraft MUST:

• Conform to all requirements of NIH Manual Chapter 1340-1. Specifically, a person wishing to export biological material must submit Form NIH-2388, "Declaration for Exportation of Biologic Materials" to the Quarantine Permit Service Office (QPSO). A person wishing to import must submit to QPSO review in advance.

• Follow mandatory conditions on applicable export license(s) and comply with all foreign import and customs requirements.

• Conform to all appropriate packaging requirements including, but not limited to, those of the Department of Transportation, International Civil Aviation Organization (specifically Special Provision A180 which provides instructions for the packing and marking requirements for non-infectious specimens), and International Air Transport Association Regulations.

• Pre-arrange screening with the Transportation Security Administration at the applicable U.S. airport of departure (for export) or port of entry (for import).

21

• Provide written approval from the airline(s) or Captain of the aircraft(s) to QPSO. Approval for transport by the first airline does not mean that subsequent or code share airlines will accept the material.

• Have a Transfer Certificate for Select Agent Materials Subjected to Validated Inactivation/Removal Methods, 42 CFR Part 73. The inactivation method must have been previously approved by the NIH IBC.

45.     Over the course of FBI's investigation of MUNSTER and KWE's CBP inspection on January 25, 2026, no indication of compliance to any of the six NIH requirements by MUNSTER or KWE has been discovered or obtained. On or about April 14, 2026, the NIH Official confirmed there are no records indicating MUNSTER or KWE provided notification to QPSO regarding the importation of the biological materials via commercial aircraft prior to their CBP inspection of January 25, 2026. The NIH Official has stated to FBI investigators that MUNSTER and KWE have received training on NIH's policies regarding the importation of biological materials. Further, the NIH Official was not notified of MUNSTER's or KWE's intention to import biological materials prior to their arrival to the United States on January 25, 2026.

46.     FBI's investigation revealed MUNSTER and KWE had received training on the Select Agent Program and importation regulations from NIH over the course of their employment at RML. MUNSTER's and KWE's training records and the associated training materials were obtained. Notably, MUNSTER and KWE received comprehensive Research Security Training on or about July 12,

22

2023. From this training, MUNSTER and KWE certified that they received training on topics, such as Select Agent Records Security, Export Control Program, Biosecurity & Biosurety Program, Research Integrity, etc. Review of the materials for this training revealed instruction on the Export Control Program at NIH, which included the import of materials. Trainees were provided a website link to NIH's website, which covers the specifics of importation requirements for biological materials to NIH[7]. Review of the website revealed a section titled, "Import Biological Materials to NIH." This section, in part, states, [i]ndividuals wishing to import any biological material (infectious or non-infectious) to the NIH must submit a request to QPSO," alongside specific requirements for the importation of non-infectious biological materials to NIH.

47.     FBI's investigation revealed Principal Investigators are responsible for obtaining permits, when required, for the importation of biological materials. The permit and importation history for MUNSTER was obtained and reviewed by your affiant. MUNSTER has obtained numerous permits from CDC and USDA over the course of his tenure at NIH. Notably, MUNSTER's most recent permit was issued by USDA on June 4, 2024, for the importation of "(h)orse sera from vaccinated horses, with a subunit vaccine containing recombinant HeVsG

---

[7] https://ors.od.nih.gov/sr/dohs/safety/laboratory/BioSafety/Pages/shipping_biological_material.aspx

glycoprotein (sub-unit vaccine)." This permit was used for one of MUNSTER's most recent imports, which occurred in 2025, for "Horse serum (uninfected)." This permit issued by USDA shows that MUNSTER acknowledged the requirements of the permit. Some of these requirements include the following:

- Imported article (including hand-carried material) may be subject to regulations enforced by U.S.. Customs and Border Protection (CBP). Please visit their website: http://cbp.gov/biologicals

- The imported material must be shipped by a commercial courier with tracking capabilities. Hand-carried material is subject to confiscation and destruction.

- This permit does not exempt the permittee from responsibility for compliance with any other applicable federal, state, or local laws and regulations.

- A copy of this permit must be included with the shipping documents. For imported materials, these documents must be presented to CBP Agricultural Specialists upon arrival at the U.S. port of arrival.

48.     Based on MUNSTER's and KWE's training histories and MUNSTER's permit and importation history, I believe MUNSTER and KWE possessed knowledge of regulatory requirements and the necessity for notification to QPSO at NIH for the importation of biological materials on January 25, 2026. I reasonably believe MUNSTER and KWE knew they were not permitted to hand-carry the biological materials via aircraft on January 25, 2026. Furthermore, I reasonably believe MUNSTER and KWE knew they were required to accurately declare the identities of the biological materials in their possession to CBP Officers

24

on January 25, 2026. I reasonably believe MUNSTER and KWE possessed knowledge they were not permitted to import the biological materials in their possession on January 25, 2026, and resorted to providing misrepresentations to CBP officials to smuggle the biological materials into the United States from the Republic of Congo.

49.    NIH records regarding MUNSTER and KWE's request to travel to the Republic of Congo in January 2026 were obtained by FBI investigators. On or about November 21, 2025, both MUNSTER and KWE submitted NIH internal requests for official travel to the Republic of Congo. On December 9, 2025, and December 11, 2025, the requests from MUNSTER and KWE were approved, respectively. MUNSTER's and KWE's approved travel requests contained identical "Trip Purpose Description" in their respective requests, which stated the following:

> Travel to Brazzaville, Congo 01/17/2026-01/23/2026. The trip is to provide continued research support for the ongoing Mpox outbreak. The focus of this trip is to strengthen local response capacity through hands-on assistance in diagnostics, genomic sequencing, and bioinformatics implementation and analysis. This support is particularly timely given the recent detection of Mpox clade Ib travel-associated cases in the United States and the ongoing community transmission observed outside of Africa included in the US. Enhancing in-country laboratory and analytic capacity will contribute to more rapid identification of cases, improved genomic surveillance, and better understanding of transmission patterns—ultimately supporting both regional and global public health preparedness. During this mission, our team will work closely with national partners to refine laboratory workflows, support real-time surveillance efforts, and ensure that data generated can be effectively interpreted and applied to outbreak control strategies.

25

50.     The aforementioned "Trip Purpose Description" did not articulate the collection or importation of Mpox samples as a part of MUNSTER's or KWE's official travel to the Republic of Congo.

51.     Both MUNSTER and KWE submitted individual invitation letters as an attachment to their travel requests from the General Directeur of the Laboratoire National de Sante Publique, Brazzaville, Republic of Congo, for a collaboration on genomic surveillance of Mpox in the Republic of Congo. This invitation did not articulate any export of Mpox samples from the Republic of Congo.

*[Remainder of page intentionally left  blank]*

## **CONCLUSION**

52.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that Vincent Jacobus MUNSTER and Claude Yinda KWE conspired to import merchandise contrary to law, in violation of 18 U.S.C. §§ 371 and 545, and gave materially false statements, in violation of 18 U.S.C. § 1001. Therefore, I respectfully request that the Court issue an amended criminal complaint and corresponding arrest warrant for Vincent Jacobus MUNSTER and Claude Yinda KWE.

<div style="margin-left:40%">

Respectfully submitted,

_____
Robert Holbrook
Special Agent
Federal Bureau of Investigation

</div>

Sworn to before me and signed in my presence
and/or by reliable electronic means.

_____
Hon. David R. Grand
United States Magistrate Judge

Dated: <u>May 29, 2026</u>